## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

UNITED STATES OF AMERICA,

                    Plaintiff,

v.

RASHID FEHMI IBRAHIM,

                    Defendant.

FILE NO. 13-CR-207(2) (SRN/TNL)

REPORT & RECOMMENDATION

Benjamin Langner, **United States Attorney's Office**, 300 South Fourth Street, Suite 600, Minneapolis, MN 55415, for the Government; and

Gary R. Wolf, **Wolf Law Office**, 250 Second Avenue South Suite 205, Minneapolis, MN 55401, for Defendant.

This matter is before the Court on Defendant Rashid Fehmi Ibrahim's Motion to Suppress Statements (ECF No. 50) and Motion to Suppress Seized Evidence (ECF No. 51). Defendant is charged with conspiracy to commit mail fraud and wire fraud in violation of 18 U.S.C. §§ 1341, 1343, 1349; mail fraud in violation of 18 U.S.C. §§ 2, 1341; aiding and abetting shipment, transport, receipt, possession, sale, distribution and purchase of contraband smokeless tobacco in violation of 18 U.S.C. §§ 2, 2342(a); and shipment, transport, receipt, possession, sale, distribution and purchase of contraband smokeless tobacco in violation of 18 U.S.C. §§ 2, 2342(a).

The Court heard oral argument on Defendant's motions. Benjamin Langner represented the Government, and Gary Wolf represented Defendant. (*See* ECF No. 57.)

The Court heard testimony from Special Agent John Murnan of the Bureau of Alcohol, Tobacco, Firearms and Explosives and Defendant. The Court received the following exhibits:

- Government Exhibits 1 and 1a are aerial photographs of 800 County Road D West in New Brighton, Minnesota, and the surrounding area;

- Government Exhibit 1-1 is an aerial photograph of 800 County Road D West in New Brighton, Minnesota, with markings made by AUSA Langner during his direct examination of Special Agent Murnan;

- Government Exhibit 1-2 is an aerial photograph of 800 County Road D West in New Brighton, Minnesota, with markings make by AUSA Langner during his cross examination of Defendant;

- Government Exhibit 1-3 is an aerial photograph of 800 County Road D West in New Brighton, Minnesota, with markings made by Defendant;

- Government Exhibits 2 and 3 are photographs of the parking area near 800 County Road D West in New Brighton, Minnesota;

- Government Exhibit 4 is a Consent to Search form signed by Defendant on October 14, 2011; and

- Government Exhibit 5 is a search warrant application dated October 14, 2011, and accompanying affidavit.

## I.   FINDINGS OF FACT

### A. Background Investigation

In late 2008 or early 2009, the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") joined a Minnesota Department of Revenue investigation into the unlicensed sale of tobacco products. (Mot. Hr'g Transcript, July 29, 2014 (ECF No. 57) at 6-7 (hereinafter ("T. 6-7").) In 2009, federal authorities prosecuted the owners of ISA Chicago Wholesale, Inc. ("ISA"), a tobacco products distributor, in the state of California. (T. 6-7.) One of the ISA owners identified Defendant as one of a number of customers that purchased other tobacco products ("OTP") for shipment to and resale in Minnesota. (T. 8.)

Specifically, the ISA owner told law enforcement that the group Defendant worked with asked ISA to delete invoices and destroy copies of invoices detailing what the group had bought. (T. 10.) The group also asked if ISA would change the description of certain purchases from "tobacco products" to "general merchandise." (T. 10.)  This change would have affected what taxes the group would be required to pay. (T. 9-11.) Documents subpoenaed from ISA also showed that Defendant and the group he was associated with purchased over $3 million of tobacco products from ISA. (T. 12.)

To sell or distribute OTP in the state of Minnesota, one must have a tobacco distributor's license from the state of Minnesota. (T. 13.) Defendant and two other individuals formed a company called American National Tobacco. (T. 15.) American National Tobacco applied for a distributor's license to sell tobacco, but the license never issued. (T. 15.)

Law enforcement obtained records from several shipping companies that showed Defendant and American National Tobacco would ship OTP to a series of addresses that were either adjacent to or near storage facilities. (T. 16-17.) Defendant would then collect the products and move them into lockers he had rented at the nearby storage facilities. (T. 16-17.) Law enforcement also confirmed that Defendant and his associates would sometimes arrive at the Root River Valley Transfer dock, load the products into their own vehicles, and compensate the dock workers with cigars or chewing tobacco. (T. 18-19.) Defendant would then take the products to one of several storage facilities in the area and store the products in lockers. (T. 19-21.)

Law enforcement also spoke with staff at Acorn Mini Storage in Northeast Minneapolis, one of the storage facilities Defendant used. (T. 20-21.) According to law enforcement, Acorn staff members were able to identify Defendant by photograph. (T. 21.) Acorn staff told law enforcement that Defendant had rented a climate-controlled unit and whenever they walked by, they could smell the distinctive odor of tobacco. (T. 21.) Staff members also told law enforcement that the door to Defendant's locker would occasionally be left open and they had seen tobacco inside. (T. 21.)

On October 15, 2010, law enforcement observed Defendant transferring boxes of OTP from his storage locker into his automobile on Acorn's video surveillance system. (T. 22.) On November 4, 2010, Acorn staff alerted law enforcement to the fact that Defendant had received a large shipment from R&L Carriers at the storage facility. (T. 22.) Officers arrived at the facility and directly observed Defendant moving OTP from the R&L Carriers truck into his storage locker. (T. 22.) The Acorn manager told

4

officers that Defendant had rented a U-Haul truck for the following day. (T. 23.) Law enforcement received permission from the Acorn manager to place a GPS tracker on the U-Haul and installed the device. (T. 23.) The next day, officers observed Defendant pick up the U-Haul and drive it away from the Acorn facility. (T. 23.) The tracking information from the GPS device showed that Defendant made several trips: one trip to two tobacco retailers in Monticello, Minnesota; one trip to several tobacco retailers in St. Cloud, Minnesota; and one trip to an address that officers later determined Defendant was using as a tobacco storage location. (T. 24-25.)

After Defendant returned the U-Haul, the Acorn manager informed law enforcement that he had left the back of the truck a mess. (T. 24.) Officers examined the items left in the vehicle and found shipping labels showing the name American National Tobacco, Rashid Ibrahim, and the Acorn facility's address. (T. 24.) Investigators then visited the retail locations that Defendant had driven to in Monticello, Minnesota, and found several boxes of OTP with torn labels that matched the labels left in the back of the U-Haul. (T. 25.)

On September 21, 2011, investigators learned that Defendant was several months behind on rent payments for his storage lockers at the Northeast Minneapolis Acorn facility. (T. 26.) Pursuant to Acorn policy, both of Defendant's lockers had been over-locked; that is, Acorn had placed their own lock on the units' doors so that Defendant could not access them unless he came current on his delinquent rent payments. (T. 26-27.) Acorn employees informed investigators that they had opened one of Defendant's lockers (unit 358) to inventory its contents before auctioning them off and

found tobacco products inside. (T. 27.) The next day, investigators arrived at the Northeast Minneapolis Acorn facility. (T. 27.) An Acorn employee opened the door to Defendant's locker unit 358, and investigators took several photographs of the locker's contents. (T. 27.)

### B.  October 14, 2011 Encounter

#### 1.  Special Agent Murnan's Testimony

Special Agent Murnan testified as follows:

On October 14, 2011, Special Agent Murnan and Special Agent Dzurak from the Minnesota Department of Revenue were investigating an unrelated matter in New Brighton, Minnesota. (T. 28.) A few minutes after 2:00 p.m., the investigators were leaving an interview in an unmarked, undercover police car. (T. 33.) Special Agent Murnan was driving. (T. 30-34.) While they were driving, both investigators recognized Defendant's car driving in the opposite direction. (T. 33.) Special Agent Murnan made a U-turn and began following Defendant. (T. 34.) Special Agent Murnan followed Defendant for a short time and had no intention to pull him over. (T. 34-35.)

Defendant then turned into a parking lot and began making odd stops and starts and U-turns. (T. 35.) According to Special Agent Murnan, Defendant would "pull into a spot that looked like he was going to park in, stop, back up, stop, pull forward to another spot, stop, back up, pull forward, go make like a left and go down the parking lot a ways and make a U-turn and come back." (T. 36.) Special Agent Murnan interpreted these movements as counter-surveillance-type movements. (T. 35-36.) Special Agent Murnan

then pulled over to the side of the road across the street from the parking lot into which Defendant had turned. (T. 35.)

Defendant continued this erratic maneuvering for a few minutes. (T. 36, 39.) Soon he stopped and vaguely motioned to the agents across the road; the agents interpreted this motion as an acknowledgement that he saw them and knew they were law enforcement. (T. 40.) Special Agent Murnan pulled his vehicle forward and stopped it in Defendant's path. (T. 39-40.) There was enough room on either side of Special Agent Murnan's vehicle for Defendant to drive around him. (T. 40.) Defendant stopped his car about 10 yards in front of Special Agent Murnan's car and made an acknowledging motion to the investigators. (T. 40-41.) Special Agent Murnan exited his vehicle and approached Defendant's car. (T. 42-43.) Special Agent Murnan wore street clothes and a light jacket; he might have had his badge hanging around his neck, and he was carrying a pistol in a holster on his right hip. (T. 42.) His coat covered his pistol. (T. 42.)

When Special Agent Murnan approached Defendant's vehicle, Defendant rolled down his window. (T. 43.) In a conversational tone of voice, Special Agent Murnan identified himself as a special agent with ATF and asked if Defendant would be willing to talk with him. (T. 43.) Defendant said that he would. (T. 43.) Special Agent Murnan asked if Defendant would step out of the vehicle for safety reasons. (T. 43.) Defendant again agreed, stepped out of his vehicle, and walked with Special Agent Murnan towards the back of the vehicle. (T. 43.)

While they were walking towards the back of the vehicle, Special Agent Murnan looked in the window and saw several boxes of what appeared to be tobacco products in

the rear passenger area of Defendant's vehicle. (T. 44.) Special Agent Murnan knew from his investigation that Defendant was not licensed to have untaxed tobacco products in the state of Minnesota, and the types and quantity of tobacco in the back of Defendant's car appeared to be delivery quantities intended for a retail location. (T. 45.)

Special Agent Murnan asked Defendant if he had any tobacco in the vehicle, and Defendant said that he did. (T. 45-46.) Special Agent Murnan then asked if Defendant would consent to a search of the vehicle, and Defendant said yes. (T. 46.) At this point, Special Agent Dzurak walked to the passenger side of the vehicle, opened the rear passenger door, and began looking at the tobacco in the vehicle. (T. 46.) Special Agent Murnan then asked if Defendant had a tobacco distributor's license. (T. 47.) Defendant responded that he had one in the back of his vehicle and offered to retrieve it. (T. 47.) Special Agent Murnan told Defendant that Defendant had already given consent to search the car and, for safety purposes, he would rather get it himself. (T. 47.)

Defendant said the license was in a manila folder in the back. (T. 47.) Special Agent Murnan opened the back of Defendant's car and Defendant directed him to the manila folder. (T. 47.) Special Agent Murnan opened the folder to find an application for a tobacco distributor's license with the state of Florida in the name of American National Tobacco. (T. 47.) Special Agent Murnan asked Defendant where he was taking the tobacco, and Defendant stated that he was taking it to a customer in Wisconsin. (T. 49.)

At this point, Special Agent Dzurak called the local police department to request another officer. (T. 50.) Special Agent Murnan thought that the extra law enforcement presence would increase crowd control and officer safety. (T. 50.) Also, Special Agent

Dzurak intended to seize the tobacco in Defendant's car, and the added law enforcement presence could assist with that process. (T. 50-51.) While they waited for the local police officer to arrive, Special Agent Murnan continued conversing with Defendant. (T. 51-52.) Defendant responded to several of Special Agent Murnan's direct questions. (T. 51-52.)

Shortly thereafter, a New Brighton police officer arrived. (T. 53.) At this point, Special Agent Murnan noticed that Defendant was getting cold. (T. 53.) Special Agent Dzurak asked Defendant if he would like to sit in the police vehicle to get warm. (T. 53.) The New Brighton officer explained that Defendant was not under arrest, but if he would like to sit in the police car to stay warm, that option was available to him. (T. 54.) Defendant agreed to sit in the back of the police car. (T. 54.)

Special Agent Dzurak then provided Defendant with a consent-to-search form. (T. 54-55.) He explained the form to Defendant, and Defendant signed the form. (T. 55.) Special Agents Murnan and Dzurak then searched Defendant's vehicle. (T. 57.) In the course of the search, the agents discovered several vials of synthetic THC. (T. 57.) The New Brighton officer determined that possessing the amount of synthetic THC in Defendant's vehicle was a felony in the state of Minnesota and arrested Defendant. (T. 57.)

### 2.  Defendant's Testimony

According to Defendant, he was leaving the gas station and saw a car that was driving the other way suddenly make a U-turn and start following him from a very close distance. (T. 110.) The car followed him for about a minute. (T. 110-11.) Defendant then turned into a parking area to look for a parking spot, and the car following him came

around and parked right in front of his vehicle. (T. 111, 133-34.) The cars were about 4 to 5 feet apart. (T. 111.)

At this point, the two investigators got out of their car. (T. 112.) Special Agent Murnan walked quickly up to Defendant's car, yelled at Defendant, identified himself as an agent with ATF, and showed Defendant his badge. (T. 113.) Throughout this interaction, Special Agent Murnan held his unholstered gun down at his side. (T. 113-14.) He then took the keys from Defendant's car, locked it, and took Defendant away from the vehicle. (T. 113.)

Special Agent Murnan asked Defendant if they could search his car. (T. 116-17.) He said that if Defendant refused consent, he would be in "big trouble" and his car would be impounded for a few days. (T. 117.) Defendant did not feel that he had a choice and consented to the search. (T. 117.) After Defendant had consented and his car had been searched, one of the investigators told Defendant to sign a consent-to-search form. (T. 119-20.) Defendant was not told what the form was, and he did not read it before signing it. (T. 120, 156.)

Within ten minutes of being stopped by Special Agent Murnan and Agent Dzurak, the New Brighton police officer arrived, immediately handcuffed Defendant, and placed him in the back of the police car. (T. 117-18.)

### C. Events Subsequent to Defendant's Arrest

After Defendant was arrested, investigators applied for and obtained a warrant to search the two storage units that Defendant had maintained at the Northeast Minneapolis Acorn facility. (T. 60; Gov't Ex. 5.) In his affidavit, Special Agent Murnan detailed the

investigation into the illegal importation and sale of OTP by, *inter alia*, Defendant. (Gov't Ex. 5.) Investigators executed the warrants and discovered tobacco products and records related to illegal tobacco trafficking inside storage units 358 and 2803 at the Northeast Minneapolis Acorn facility. (T. 62.)

## II.    CONCLUSIONS OF LAW

Defendant moves to suppress the following: (1) all evidence obtained from the search of his vehicle, arguing he was seized without probable cause; (2) all statements made to law enforcement on October 14, 2011, arguing that the statements were the product on the unconstitutional seizure; and (3) the fruits of the agents' October 14, 2011 searches, arguing that the warrants were not supported by probable cause.

### A. Vehicle Stop

#### 1. Defendant Was Not Seized

Defendant argues that his statements to Special Agents Murnan and Dzurak on October 14, 2011 must be suppressed because they were the products of an un-Mirandized custodial interrogation. Defendant takes the position that the investigators seized him when they approached his vehicle on October 14, 2011.

It is axiomatic that not all encounters between law enforcement and private citizens constitute seizures that implicate the Fourth Amendment. *United States v. Beck*, 140 F.3d 1129, 1135 (8th Cir. 1998) (citing *Terry v. Ohio*, 392 U.S. 1, 19-20 n.16 (1968)). "A seizure does not occur simply because a law enforcement officer approaches an individual and asks a few questions or requests permission to search an area—even if the officer has no reason to suspect the individual is involved in criminal activity—

provided the officer does not indicate that compliance with his request is required." *United States v. White*, 81 F.3d 775, 779 (8th Cir. 1996) (citing *Florida v. Bostick*, 501 U.S. 429, 434-35 (1991)).

"There is no bright line between a consensual encounter and a *Terry* stop, rather, the determination is a fact intensive one which turns upon the unique facts of each case." *Beck*, 140 F.3d at 1135 (citations omitted). Some circumstances that indicate a seizure has occurred include "'the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled.'" *United States v. Angell*, 11 F.3d 806, 809 (8th Cir. 1993) (quoting *United States v. Mendenhall*, 446 U.S. 544, 554 (1980)). So long as a reasonable person would feel free "'to disregard the police and go about his business,'" however, a seizure has not occurred and the encounter does not implicate any Fourth Amendment interest. *Florida v. Bostick*, 501 U.S. 429, 434 (1991) (quoting *California v. Hodari D.*, 499 U.S. 621, 628 (1991)); *White*, 81 F.3d at 779.

Whether Defendant was seized depends almost entirely on which version of the facts the Court finds credible, Special Agent Murnan's or Defendant's. The Court notes that Special Agent Murnan credibly testified to his version of events. Special Agent Murnan's demeanor and statements were straightforward. He did not seem defensive or to be hiding anything. His testimony was clear and the facts he recalled were materially borne out by the exhibits offered into evidence. Defendant's testimony, on the other hand, was inconsistent with the version of events set forth in his moving papers. Defendant's

12

demeanor was not straightforward and did not seem credible. Accordingly, the Court finds Special Agent Murnan's testimony credible and affords little weight to Defendant's testimony.

Taking the totality of the circumstances into consideration, the Court determines that Defendant was not seized by law enforcement when the October 14, 2011 encounter began. Shortly after Special Agents Murnan and Dzurak began following Defendant, Defendant started driving evasively. Special Agent Murnan stopped his car across the street from the parking lot Defendant was driving in, and Defendant soon pointed his vehicle towards the investigators and stopped. He acknowledged the agents' presence with either a wave or a head nod. Special Agent Murnan drove towards Defendant's vehicle, stopped about 10 yards away, exited his car, and walked towards Defendant's vehicle. Special Agent Murnan was not wearing a police uniform, but his badge was displayed. He was armed, but he was not wielding his pistol. He did not stop Defendant from driving around him and leaving, and he never told Defendant to stop. As Special Agent Murnan approached, Defendant rolled down his window. Special Agent Murnan identified himself as a law enforcement officer and calmly asked if Defendant would be willing to speak with him, and Defendant said he would. When Special Agent Murnan asked if Defendant would be willing to get out of his vehicle, Defendant agreed to step out. Special Agent Murnan did no more than follow Defendant on the open road in an unmarked car, park across the street, step out, and identify himself as law enforcement. Special Agent Murnan and Defendant then walked towards the back of the vehicle together. Special Agent Murnan saw a substantial amount of tobacco products in the

vehicle and asked Defendant if he would consent to a search of the vehicle. Defendant said that he would.

Up to this point in the encounter, there was no detention that required any degree of suspicion. *See United States v. Davis*, 202 F.3d 1060, 1062 (8th Cir. 2000) (no seizure where officers exited squad car, approached the defendant, asked to speak with him, and conducted a pat-down); *United States v. Dockter*, 58 F.3d 1284, 1287 (8th Cir. 1995) (no seizure where police pulled up behind defendant's parked car even though the officer activated his flashing lights); *Angell*, 11 F.3d at 809-10 (no seizure where officer shined his flashlight on defendant's car, began asking the occupants who they were and what they were doing, and said something like, "Stay there, I want to talk to you."). Special Agent Murnan spoke with Defendant in a conversational tone, did not order Defendant to do or refrain from doing anything, and nothing was presented to Defendant as though he was required to comply. Defendant's acquiescence to and cooperation with the Special Agent Murnan's requests is not determinative evidence that he was seized within the meaning of the Fourth Amendment. A reasonable person in Defendant's position would have felt free to end the encounter and return to his vehicle. Defendant "had simply encountered a police officer in a public place. No reasonable person would have believed he was seized at that point." *United States v. Barry*, 394 F.3d 1070, 1075 (8th Cir. 2005). Accordingly, the Court determines that Defendatn was not seized in violation of his Fourth Amendment rights.

### 2.   Defendant's Statements are admissible

In light of the above determination that Defendant was not seized until he was arrested by New Brighton police, the Court further determines that Defendant was not "in custody" for *Miranda* purposes when he responded to Special Agent Murnan's questions. *Compare Brendlin v. California*, 551 U.S. 249, 255 (2007) (a seizure occurs when a reasonable person would not feel "free to leave"), with *J.D.B. v. North Carolina*, 131 S. Ct. 2394, 2402 (2011) (quoting *Thompson v. Keohane*, 516 U.S. 99, 112 (1995)) (whether a suspect is in custody for *Miranda* purposes turns on the circumstances surrounding the interrogation and whether "'a reasonable person [would] have felt he or she was at liberty to terminate the interrogation and leave.'"). Therefore, any statements Defendant made before his arrest are admissible. Accordingly, Defendant's motion to suppress statements must be denied.

### 3.   Defendant's Consent to Search Was Voluntary

Defendant also challenges the search of his vehicle, arguing that his consent to search was coerced.  "A defendant's voluntary consent . . . is an exception to the Fourth Amendment's warrant requirement." *United States v. Esquivias*, 416 F.3d 696, 700 (8th Cir. 2005) (citing *Schneckloth v. Bustamonte*, 412 U.S. 218, 222 (1973)). In determining whether the government has met its burden to prove by a preponderance of the evidence that Defendant's consent was freely given, "courts look to both the characteristics of the accused and the details of the environment in which the consent was given." *White*, 81 F.3d at 780; *see also United States v. Chaidez*, 906 F.2d 337, 381 (8th Cir. 1990) (listing relevant factors and characteristics in determining whether consent was freely given).

In light of the above credibility determinations, the totality of the circumstances shows that the agents reasonably could have concluded that Defendant's consent to search was voluntary. Defendant told Special Agents Murnan and Dzurak that they could search his vehicle before the New Brighton police officer arrived. There is no evidence that Defendant was intoxicated during his interaction with Special Agents Murnan and Dzurak; he understood Special Agent Murnan's questions; and Special Agent Murnan did not employ deception, threats, or promises to obtain his consent. Special Agents Murnan and Dzurak did not employ any coercive tactics to obtain Defendant's consent to search.

Moreover, Defendant was not detained before he consented to the search. Defendant gave his consent "on a public roadway during daylight hours," *United States v. Buenrostro*, 454 Fed. App'x 523, 526 (8th Cir. 2011). Although Defendant was not informed that he could refuse consent, "a defendant need not be aware, nor must an officer inform him, of his right to refuse consent for his consent to be voluntary." *United States v. Becker*, 333 F.3d 858, 861 (8th Cir. 2003). Defendant signed the consent while he was sitting in the back of the New Brighton officer's squad car, but he had repeatedly been told he was not under arrest. He was free to exit the squad car at any time, and he remained unhandcuffed.  Under the totality of these circumstances, a reasonable officer would have believed that Defendant's consent was voluntary. Accordingly, his motion to suppress must be denied.

### 4.  Automobile Exception to the Warrant Requirement Applies

Even if Defendant's consent to search was not voluntary, the search of his vehicle and subsequent seizure of the tobacco products were permitted under the automobile

exception to the warrant requirement. The automobile exception allows law enforcement to "search a vehicle without a warrant if they have probable cause to believe the vehicle contains evidence of criminal activity." *United States v. Davis*, 569 F.3d 813, 817 (8th Cir. 2009) (quoting *United States v. Cortez-Palomino*, 438 F.3d 910, 913 (8th Cir. 2006) (per curiam) (internal quotation marks omitted)). "Probable cause exists where there is a 'fair probability that contraband or evidence of a crime will be found in a particular place." *United States v. Brown*, 634 F.3d 435, 438 (8th Cir. 2011) (quoting *United States v. Donnelly*, 475 F.3d 946, 954 (8th Cir. 2007)).

Special Agents Murnan and Dzurak had been investigating Defendant for more than two years. They had observed him loading and unloading tobacco products into and out of his vehicle. They knew that he did not have a tobacco distributor's license from the state of Minnesota. They had tracked Defendant to several tobacco retailers and connected merchandise missing labels to torn label remnants in the U-haul he had rented the previous day. When Special Agent Murnan walked towards the back of Defendant's vehicle, he saw delivery quantities of tobacco products through the window. Under the totality of the circumstances, probable cause justified the search of Defendant's vehicle.

Moreover, the plain view doctrine allowed law enforcement to seize the tobacco products in Defendant's vehicle. "It is settled that an officer, without a warrant, may seize an object in plain view provided the officer is lawfully in the position from which he or she views the object, the object's incriminating nature is immediately apparent, and the officer has a lawful right of access to the object." *United States v. Darr*, 661 F.3d 375, 379 (8th Cir. 2011) (quoting *United States v. Bustos-Torres*, 396 F.3d 935, 944 (8th Cir.

2005)). "'Immediately apparent' means that the officers have probable cause to associate the object with criminal activity." *Id.* (citing *United States v. Hatten*, 68 F.3d 257, 261 (8th Cir. 1995)). Here, Special Agent Murnan was walking around Defendant's vehicle and saw what he determined to be delivery quantities of tobacco products through the window. The agents knew that Defendant did not have a tobacco distributor's license. The agents had also tracked Defendant to several tobacco retailers throughout the state and connected certain merchandise on the retailers' shelves with torn labels left in the back of Defendant's rented U-Haul. They had observed Defendant loading and unloading OTP at storage facilities, and Defendant had been named by criminal defendants in another prosecution. Under the totality of these circumstances, there was a reasonable probability that evidence of a crime would be located inside Defendant's vehicle, and Special Agent Murnan had probable cause to associate the tobacco he saw in Defendant's vehicle with criminal activity. Accordingly, even if Defendant's consent to search was not voluntary, law enforcement was authorized in these circumstances to search Defendant's vehicle and seize the tobacco inside without a warrant.

### B. Probable Cause Supported Search Warrants

Defendant asserts that the search warrants were not supported by probable cause. Again, "[p]robable cause exists where there is a 'fair probability that contraband or evidence of a crime will be found in a particular place." *Brown*, 634 F.3d at 438 (quoting *Donnelly*, 475 F.3d at 954). Probable cause determinations "d[o] not deal with hard certainties, but with probabilities." *Illinois v. Gates*, 462 U.S. 213, 231 (1983). "The task of the issuing magistrate is simply to make a practical, common-sense decision whether,

given all the circumstances set forth in the affidavit before him, . . .there is a fair probability that contraband or evidence of a crime will be found in a particular place. And the duty of a reviewing court is simply to ensure that the magistrate had a 'substantial basis for . . . conclude[ing]' that probable cause existed." *Id.* at 138-39 (quoting *Jones v. United States*, 362, U.S. 257, 271 (1960)). Specifically, Defendant argues that: (1) the evidence obtained from the GPS tracking on his rented U-Haul should be excised from the warrant application because law enforcement did not obtain a warrant first; and (2) investigators violated his Fourth Amendment rights by looking in his rented storage lockers without first obtaining a warrant.

### 1.  GPS Tracking of U-Haul Was Not a Search

First, Defendant seeks to excise from the affidavit supporting the warrant application all evidence obtained from law enforcement's use of a GPS tracking device on the U-Haul truck that he rented. On November 4, 2010, investigators obtained the rental company's consent to place a GPS device on the truck that Defendant was going to rent the following day. Using that GPS device, investigators tracked Defendant to several tobacco retailers throughout Minnesota and eventually linked merchandise on those retailers' shelves to OTP that Defendant was selling. Defendant argues that the use of a GPS tracking device was a warrantless search and, therefore, all evidence obtained therefrom must be suppressed.

This argument is unavailing. In *United States v. Karo*, law enforcment obtained an informant's consent to install a tracking beeper in a can of ether that Karo was scheduled to purchase the next day. 468 U.S. 705, 708 (1984). The Supreme Court held that a

defendant's Fourth Amendment rights are not violated when law enforcement installs a tracking beeper in a chemical container pursuant to the original owner's consent, the container is subsequently transferred to the defendant, and law enforcement uses the tracking device to track him. *Id.* at 711-13.

Here, Special Agents Murnan and Dzurak obtained the rental agency's consent to place a GPS tracking device on a U-haul truck that Defendant was going to rent the following day. Defendant rented the truck, and the agents tracked his movements with the GPS tracking device. "Like the defendant in *Karo*, Defendant 'accepted the [vehicle] as it came to him, [GPS device] and all, and [is] therefore not entitled to object to the [GPS device's presence], even though it was used to monitor the [vehicle's] location.'" *United States v. Barraza-Maldanado*, 879 F. Supp. 2d 1022, 1028 (D. Minn. 2012) (quoting *United States v. Jones*, 132 S. Ct. 945, 952 (2012)). Accordingly, the Court determines that the installation and monitoring of a GPS tracking device on Defendant's rented U-haul was not a "search" for purposes of the Fourth Amendment.

### 2.  Looking into Defendant's abandoned storage lockers was not a search

Defendant also argues the information obtained by the September 22, 2011 examination of one of Defendant's storage lockers at the Acorn Mini-Storage facility in Northeast Minneapolis was obtained in violation of his Fourth Amendment rights. "To successfully challenge the constitutionality of [a] search, [Defendant] must show that he possessed a reasonable expectation of privacy in the area searched or the items seized." *United States v. Reyes*, 908 F.2d 281, 285 (8th Cir. 1990) (citing *California v.*

*Greenwood*, 486 U.S. 35, 39 (1988); *Rakas v. Illinois*, 439 U.S. 128, 148-49 (1978);
*Smith v. Maryland*, 442 U.S. 735 (1979); and *Katz v. United States*, 389 U.S. 347, 362
(1967)).

Defendant rented two storage united at the Northeast Minneapolis Acorn Mini-Storage facility: unit 2308 and unit 358. Defendant stopped paying rent on unit 358 in July 2011. After Defendant had stopped making payments, unit 358 was over-locked, and on September 21, 2011, an Acorn employee informed investigators that Defendant's lock had been removed. Both of these actions—over-locking unit 358 and removing a non-paying tenant's lock—occurred pursuant to Acorn policy. Investigators arrived at the Northeast Minneapolis Acorn facility on September 22, 2011, and requested to look inside unit 358. An Acorn employee opened the unit and investigators photographed the unit's contents.

In *Reyes*, Reyes attempted to suppress evidence obtained from search of a storage locker at a bus station. 908 F.2d at 285. There, Reyes had rented the locker for a 24-hour period beginning November 30. *Id.* The policy printed on the front of the locker warned that if the renter did not renew his rental period or remove his items, the rental company would remove them and possibly sell them. *Id.* Law enforcement searched the locker on December 12. *Id.* at 284. The Eighth Circuit determined that because Reyes's rental term had expired several days before law enforcement searched the locker, he had no reasonable expectation of privacy in the locker's contents. *Id.* at 285-86.

*Reyes* is directly on point. Defendant's rental period for unit 358 expired in July 2011 due to non-payment. At that point, Acorn employees over-locked the unit,

effectively barring even Defendant from accessing it. Law enforcement examined the locker's contents months after Defendant's rental lapsed for non-payment. Accordingly, the Court determines that investigators' opening and examination of unit 358 was not a search because Defendant had no objectively reasonable expectation of privacy in the contents of the storage locker. *Id.* at 286 ("Because the rental term had expired, Reyes had no expectation of privacy in the locker."). Accordingly, his motion to suppress with respect to any evidence obtained by looking into unit 358 must be denied.

### 3.  Probable Cause Supported the Warrant

The Court determines probable cause supported the warrant to search Defendant's former storage lockers. As set forth in the affidavit, Special Agents Murnan and Dzurak had been investigating Defendant for more than two years based on information obtained from cooperating defendants. They had observed Defendant loading and unloading significant amounts of tobacco products into and out of his vehicle on multiple occasions, both in person and on video. They knew that he did not have a tobacco distributor's license from the state of Minnesota. On one occasion, they tracked Defendant to several tobacco retailers and connected merchandise missing labels to torn label remnants left in the U-Haul he had rented the previous day. Special Agents Murnan and Dzurak had both seen inside one of Defendant's storage lockers after the storage facility had removed his lock and opened his locker. Based on the totality of the circumstances, the Court determines that the facts set forth in the supporting affidavit established a sufficient basis for the issuing judge to have concluded that it would be reasonable to seek evidence in Defendant's former storage lockers.

### III.    RECOMMENDATION

Based on the foregoing, and all the files, records and proceedings herein, **IT IS HEREBY RECOMMENDED** that Defendant's Motion to Suppress Statements (ECF No. 50) and Motion to Suppress Seized Evidence (ECF No. 51) be **DENIED**.


Date:  October 9, 2014                          s/ Tony N. Leung
                                                Tony N. Leung
                                                United States Magistrate Judge
                                                District of Minnesota

                                                *United States v. Ibrahim*
                                                File No. 13-cr-207(2) (SRN/TNL)


Pursuant to Local Rule 72.2(b), any party may object to this Report and Recommendation by filing with the Clerk of Court and by serving upon all parties written objections that specifically identify the portions of the Report to which objections are made and the basis of each objection. This Report and Recommendation does not constitute an order from the District Court and it is therefore not directly appealable to the Circuit Court of Appeals. Written objections must be filed with the Court on or before **October 17, 2014**, and written responses to any objections must be filed with the Court on or before **October 24, 2014.**